[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a suit for dissolution of marriage brought by the plaintiff wife against the defendant husband. The parties were married on April 8, 1961 in New Britain, Connecticut. There has been one child born, issue of the parties, a daughter Laura who is now 24 years of age, recently married and a second year law student at Western New England Law School.
The allegations of the complaint are admitted by the defendant. It is the first marriage for each of the parties. The plaintiff is 52 years of age, in general good health, and has CT Page 7080 a high school diploma. The defendant is 57 years of age, in relatively good health and has a high school diploma. In the middle of the trial the defendant had a lumbar disc removed, on February 14, 1992, in an operation performed at the Hartford Hospital. There were several weeks of recuperation. At present he says he has no feeling in the bottom of his left foot and in his right thigh. The defendant is a contractor and 50% owner in the contracting firm of Genovese DiDonno, Inc. and a one-third owner in Construction Unlimited, Inc.
At the time of their marriage the plaintiff worked at Hubbard Hall Chemical Company and was so employed for three years doing billing and payroll. Thereafter she worked for Genovese DiDonno as bookkeeper. In May 1968 Laura was born and the plaintiff thereafter stayed at home and raised her and cooked, cleaned, and took care of the home. In 1985 she went to work for Construction Unlimited, Inc. and worked there until December 1989 when she was laid off. She has not worked since that time. At the time of trial she was collecting unemployment compensation. It was contemplated that this would terminate the end of June.
While the plaintiff has testified that she has no physical or mental problems, she was hospitalized on two prior occasions for psychiatric treatment. She was admitted to Elmcrest Hospital on an involuntary commitment in December 1977 at which time she was diagnosed as suicidal. Upon her release from Elmcrest she was hospitalized in Cedarcrest and then released to her sister's home until the summer of 1978. She was a patient again at Elmcrest in 1979 on a voluntary commitment. She has seen a psychiatrist since 1979 and says she has no psychiatric problems.
Sometime between 1973 to 1974 the plaintiff developed a drinking problem. This continued into 1977. Since her stay at Elmcrest she has not been drinking. The defendant testified the drinking existed the first fifteen years of the marriage.
The marriage of the parties has broken down over time. This action was commenced on August 1, 1990. There have been two prior dissolution actions initiated by the plaintiff. The plaintiff claims the defendant belittled her by constantly putting her down, and that he was mean and violent. She is absolutely frightened by the defendant. While they remained living in the marital home until January of this year when the defendant moved out, she has continued to remain in her bolted room afraid that he would return.
The plaintiff describes three instances of physical abuse and meanness by the defendant over the period of thirty years. They sought marriage counseling early in the 1970's and went to a marriage encounter in 1975. The defendant had an admitted CT Page 7081 affair in 1982 and 1983. This knowledge caused the plaintiff to commence one of the prior dissolution actions. The defendant begged her forgiveness and the action was withdrawn.
The plaintiff is a timid, frightened person. She was slow in answering questions. While she stated that she was in general good health except for her hair loss problem, it is clear that she must have financial support. While the plaintiff complains of the defendant's conduct, the defendant, except for his affair in 1982 and 1983, has stood by the plaintiff. He has stood by her even though she constantly accused him of infidelities, threatened to kill herself and their child prior to her first hospitalization, and imbibed sometimes to excess during the first fifteen years of their marriage. He did not want a divorce. He had been hopeful that they would reach retirement age, he would then sell his share of the businesses, and they would retire to Florida. In 1989 they met with a financial planner and upon the financial planner's advice, the defendant transferred the house and Florida property entirely into the plaintiff's name for estate planning purposes. Their daughter's wedding was on July 23, 1990. The plaintiff testified that she felt the defendant was mean to their daughter over the finances of the wedding even though he contributed $15,000 to the wedding expenses. It was this so-called meanness that triggered the commencement of this action. The court finds that the marriage is broken down irretrievably and that each contributed to the breakdown of the marriage and each is at fault for the breakdown.
The division of the assets of the parties is not easy of solution. The court considers certain of the factors of 46b-81
of the General Statutes as weighing heavier than others, those factors being the length of the marriage, the acquisition and preservation of the assets of the parties during the marriage and the contribution of each and the needs of the plaintiff for her support. Also to be considered is the extremely costly expense of this litigation.
PROPERTY
At the beginning of their marriage, the parties lived with the defendant's family. "A couple of years" after the parties' marriage, the plaintiff's mother died. The parties bought out the plaintiff's sisters' shares (three sisters) with accumulated savings. This house was on Myrtle Street in New Britain. In 1965 the defendant and Mr. Genovese formed Genovese DiDonno, Inc. in the basement of their Myrtle Street home. The business thereafter moved to Mr. Genovese's mother's garage. In 1983 the business moved to its current location at 1623 Berlin Turnpike in Berlin. CT Page 7082
In 1969 the parties moved to their present home at 25 Pattonwood Drive in Southington, Connecticut. This home was built by the defendant from a plan picked out of a magazine by the plaintiff. Its cost was $236,000, paid for with the profit of their Myrtle Street home and a mortgage.
Genovese DiDonno, Inc. is a construction company. Its business is interior construction, ceilings and dry walls. Initially it was two owners — Mr. Joseph Genovese and the defendant. Subsequently a third owner joined the company, Mr. Joseph Squillacote. Each owned equal shares. In August 1991 Mr. Genovese died. The corporations are in the process of settling his share of the businesses.
In 1985 the three parties, together with a fourth individual, formed Construction Unlimited, Inc. This business, conducted primarily by the defendant, built residential homes. It has had little business these past few years.
There are other businesses: JFJ Realty, Inc., a partnership, which owns the building and land where the businesses are conducted, GDS Contracting Corp., which has a negative book value and Farms Development Corporation. The stockholders of Construction Unlimited, Inc. own a one-half interest in Brookswoods Development, a partnership. (See Plaintiff's Exhibit M, page 9).
In 1986 the parties purchased three lots in Palm Coast, Florida, for a purchase price of $65,000 each. The plaintiff values these lots today at $205,000. The defendant values the lots at $210,000. The parties also purchased a house and lot at 25 Clearview Court in South Palm Coast for $155,000, which included $20,000 in furnishings. The defendant values this property today at $140,000 and the plaintiff values this property at $130,000. It is subject to a mortgage with a principal balance of $81,620 at the end of 1991. (See Plaintiff's Exhibit RR).
There is a stockholders' agreement by the stockholders of Genovese DiDonno, Inc., setting forth the value of each stockholder's share at $100,000. (See Plaintiffs Exhibit H). Life insurance policies owned by the corporation funded the agreement. It is the defendant's position that this governs the value of his shares in this corporation. There is a like agreement covering the interests of each of the partners in JFJ Realty and valuing each individual interest at $10,000. (See Plaintiff's Exhibit I). Life insurance also funds this agreement in an amount of $100,000. The partners believe the settlement with the Estate of Joseph Genovese will be $100,000 for his shares in Genovese DiDonno, Inc. and $300,000 for his interest in JFJ Realty. ($100,000 in cash and a note for $200,000 secured CT Page 7083 by a second mortgage on the property to be amortized in equal monthly payments over seven years.) Based upon Mr. Ringrose's appraisal and after payment to the Genovese Estate, the value of the defendant's interest in JFJ Realty is $133,000.
The defendant, apparently, has not considered that he is bound by the terms of the Genovese DiDonno stockholders' agreement. In 1990 he valued his interest in this corporation at $286,000. (See Plaintiff's Exhibit SS). This same figure was used in a personal financial statement to Fleet Bank in 1990 (see Plaintiff's Exhibit TT) and a figure of $252,000 in a statement of November 4, 1991 (see Plaintiff's Exhibit UU). Mr. Kenneth Pia, the certified public accountant called by the plaintiff, valued the defendant's interest in Genovese DiDonno, after a discount factor of 20%, at $300,000 after the corporation's settlement with the Genovese Estate. Mr. Pia valued the defendant's interest in Construction Unlimited, Inc. at $37,000. He was of the opinion that GDS Contracting Corp. (the non-union operating arm of Genovese DiDonno, Inc.) had a negative value of $17,865.
Finally to be considered is the value of the unimproved lots in New Smyrna, Florida. This property is owned in the defendant's name. In his financial affidavit he values these lots at $20,000. On his financial statement supplied to American National Bank in November 1991 he valued these lots also at $20,000 and showed a purchase price of $16,000 with the purchase in March 1980. Plaintiff testified there are 8 lots with an assessed value of $3,691 each for a total assessed value of $29,528.
The defendant has two antique cars. It was stipulated that the plaintiff would keep her jewelry and the defendant would keep his antique cars. In her financial affidavit the plaintiff values her jewelry at $22,878. In his financial affidavit the defendant values his antique car collection at $13,000, although he values these cars at $30,000 in his statement to Fleet Bank as of October 31, 1990. (See Plaintiff's Exhibit TT).
Each of the parties have sizeable bank account balances. The plaintiff has $66,687 in bank accounts and the defendant has $39,912 in bank accounts. They equally divided their bank accounts in 1990 when this action was commenced.
A division of certain of the property may be made by dividing in half. This is certainly true as to the Condere Corporation stock, the defendant's IRA and his pension plan. The parties having divided their bank accounts earlier, the court is not going to redivide those accounts. CT Page 7084
The court values the remaining property as follows:
 25 Pattonwood Drive Southington net value $ 231,000
 25 Clearview Drive Palm Coast, Florida net value $ 55,000
 Vacant Lots Palm Coast, Florida net value $ 210,000
Florida Furniture $ 20,000
Connecticut Furnishings $ 5,000
 Vacant Lots New Smyrna, Florida $ 30,000
 400 Shares Genovese DiDonno, Inc. $ 300,000
JFJ Realty, Inc. $ 133,000
 250 Shares Construction Unlimited, Inc. $ 37,000
 100 Shares GDS Contracting Corp. ($ 17,865)
1983 Searay Boat $ 15,000
 Note Receivable — Genovese DiDonno, Inc. $ 33,000
 Note Receivable — Construction Unlimited, Inc. $ 28,000 ------------- $1,079,135
INCOME
The defendant receives an annual income of $72,800 from Genovese DiDonno, Inc. ($1400 per week) and a net income of $1037.00 per week. As previously noted the plaintiff is receiving unemployment compensation of $139.00 per week which, after taxes, results in a net weekly income of $93.00 per week. Her twenty-six week extension on unemployment compensation was to expire the end of June. It is anticipated that the plaintiff will return to work. The court concludes that $17,500 of her gross annual earnings should be excluded before considering CT Page 7085 whether there has been a substantial change of circumstances warranting modification.
COUNSEL FEES
Trial of this matter commenced on October 31, 1991. For numerous reasons, one of which was the defendant's back surgery, the trial was interrupted. There have been thirteen trial days and 60 exhibits. Plaintiff's counsel had to familiarize himself with numerous business interests of the defendant and engage the services of an appraiser and a business evaluator. Mr. Squillacote's deposition was taken three times to obtain current financial information regarding the defendant's interests. The fees for the business appraiser amounted to $10,160. The fees for the real estate appraiser amounted To $1,575. Legal services claimed by plaintiff's counsel amounted to $60,000. Defendant's counsel has incurred fees and expenses in excess of $30,000.
It is indeed unfortunate that such consequential fees were incurred in this matter. As previously noted, however, the valuation of the defendant's financial interests was difficult. Exhibits H through MM all have to do with the issue of business valuation. In reaching a determination on the issue of fees the court has considered the provisions of 46b-62 of the General Statutes and the factors of 46b-82 of the General Statutes. The amount of counsel fees ordered has been considered by the court in its division of property pursuant to the provisions of 46b-81
of the General Statutes and a failure to so award counsel fees would substantially undermine the other financial orders. Maguire v. Maguire, 222 Conn. 32, 44 (1992).
In determining the proper orders in this case the court must consider the factors of 46b-81 and 46b-82 of the General Statutes. With respect to alimony and a division of the property, the law to be considered has been stated as follows:
 To begin with, our alimony statute does not recognize an absolute right to alimony, General Statutes 46b-82; Thomas v. Thomas, 159 Conn. 477, 487, 271 A.2d 42 (1970); `This court has reiterated time and again that awards of financial settlement ancillary to a marital dissolution rest in the sound discretion of the trial court.' (Citation omitted.) Although the court is required to consider the statutory criteria of length of marriage, causes for dissolution, the age, health, station in life, occupation, amount and CT Page 7086 sources of income, assets and opportunity for future acquisitions of assets of each of the parties, (citation omitted), no single criterion is preferred over all the others. In weighing the factors in a given case, the court is not required to give equal weight to each of the specified items. Nevertheless, it is rather obvious that in making financial determinations, the financial circumstances, both actual and potential, are entitled to great weight. Valente v. Valente, 180 Conn. 528, 530
(1980); Watson v. Watson, 221 Conn. 698, 710 (1992).
As has been said by the Appellate Court in the recent case of Emanuelson v. Emanuelson, 26 Conn. App. 527, 530, 531 (1992):
 "General Statutes 46b-82(c) requires the trial court to evaluate certain factors before distributing the parties' assets in a marital dissolution action. Although the court must evaluate all the factors listed, it had broad discretion when applying the statutory factors to assign the parties' assets. O'Neill v. O'Neill, 13 Conn. App. 300, 312, 536 A.2d 978. Cert. denied 207 Conn. 806, 540 A.2d 374 (1988). . . .
 The statutory factors for determining alimony in 46b-82 are almost identical to the factors used to distribute property in 46b-81(c)."
The court has considered all of the criteria of 46b-81 and46b-82 of the General Statutes together with all of the evidence and the case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account," Scherr v. Scherr,183 Conn. 366, 368 (1981), this court will not recount those statutory criteria and the evidence, other than has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria." Weiman v. Weiman,188 Conn. 232, 234 (1982).
Suffice to say that the court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding. Leo v. Leo, 197 Conn. 1, 5
(1985), and that the court need not give equal weight to each CT Page 7087 factor. Kane v. Parry, 24 Conn. App. 307, 313-314 (1991).
The court, in addition to the foregoing findings, finds as follows:
1. There is the requisite jurisdiction.
2. The allegations of the complaint have been proved and are true.
3. There has been an irretrievable breakdown of the marriage.
4. Each of the parties have contributed to the cause of the breakdown of the marriage.
The court enters the following orders:
1. A decree of dissolution of marriage shall enter on the grounds of irretrievable breakdown of the marriage.
2. The defendant shall pay to the plaintiff as alimony the sum of $450.00 per week to commence August 1, 1992. Until such time the current pendente lite orders shall remain in effect. The plaintiff may earn up to a gross amount of $17,500 annually before consideration of whether or not there has been a substantial change in her financial situation. Alimony shall terminate upon the earliest to occur of the following events: the death of either party or the plaintiff's remarriage. The defendant shall supply copies of his W-2 forms, any 1099's and K-1's each year upon receipt of the same. Each party shall furnish copies of his or her income tax return to the other party simultaneous with the filing of the same with the appropriate governmental authority.
3. A Qualified Domestic Relations Order in compliance with 414(p) and any other applicable section of the Internal Revenue Code of 1986, as amended, shall enter assigning to the wife one-half of the defendant's retirement funds, including:
a. GDS. Inc. Money Purchase Pension Plan;
b. GDS. Inc. Profit Sharing Plan;
c. Genovese DiDonno, Inc. Money Purchase Plan, and
d. Genovese DiDonno, Inc. Profit Sharing Plan.
4. The defendant shall maintain life insurance in the amount of $250,000 naming the plaintiff as irrevocable first beneficiary CT Page 7088 thereof for so long as he is obligated to pay alimony.
5. Any claim by the defendant, whether legal, equitable or of any nature and description is hereby extinguished and the plaintiff shall own solely, free from any claim of right, title or interest by the defendant, the following real property
 a. The marital residence located at 25 Pattonwood Drive, Southington, Connecticut, subject only to the present first mortgage with the approximate balance of $5,000;
 The defendant shall transfer to the plaintiff the proceeds of a certain homeowner's insurance flood damage award and shall assign the balance of the claim to the plaintiff;
 b. The real property located in Palm Coast, Florida, and known as Section 14, Block 7, Lots 183 and 184 and Section 6, Block 8, Lot 19.
6. The defendant shall transfer to the plaintiff one-half of his Condere Corporation Stock.
7. The plaintiff shall own solely, free from any claim of right, title or interest by the defendant, the following:
 a. Her American Savings Bank Individual Retirement Account;
b. Her American Savings Bank savings account;
c. Her jewelry;
 d. All personal property, home furniture and furnishings located in the parties' vacation home at 25 Clearview Court, South Palm Coast, Florida, listed on Schedule A appended hereto; and
 e. All personal property, home furniture and furnishings located in the marital residence at 25 Pattonwood Drive, Southington, Connecticut, except those items listed in Schedule B appended hereto which the defendant shall own.
8. The defendant shall own solely, free from any claim of right, title or interest by the plaintiff, except as hereinbefore provided, the following:
a. His American Savings Bank Individual CT Page 7089 Retirement Account;
b. His Buick and Maxwell antique automobiles;
c. His 1970 Cadillac;
 d. The real property lots in New Smyrna, Florida;
e. His interest in GDS Contracting Corp.;
 f. His interest in Town Farms Estate Partnership;
g. His interest in Genovese DiDonno, Inc.;
h. His interest in Construction Unlimited, Inc.;
i. His interest in JFJ Realty, Inc.;
j. His savings and loan account;
k. His boat;
 l. The note receivable from Genevese DiDonno, Inc. in the amount of $33,000;
 m. The note receivable from Construction Unlimited, Inc. in the amount of $28,000.
9. The plaintiff shall convey all of her right, title and interest in and to the property at 25 Clearview Court, South Palm Coast, Florida, to the defendant subject to the existing mortgage to Suntrust Mortgage, Inc. in return for the sum of Twenty Seven Thousand Five Hundred ($27,500) Dollars to be paid by the defendant to the plaintiff. Upon such conveyance and until said transfer of title, the defendant shall be wholly responsible for the mortgage, insurance and taxes on such property and shall indemnify and hold harmless the plaintiff from any claims or demands thereon.
10. The defendant shall pay to the plaintiff the sum of Thirty-Five Thousand ($35,000) Dollars as a contribution towards the plaintiff's counsel fees and costs in connection with this proceeding.
11. The defendant shall maintain health care coverage for the plaintiff to the same extent as has been provided to her through her employment for so long as permitted under the provisions of 38a-538 of the General Statutes at the plaintiff's CT Page 7090 expense.
12. The defendant shall cause the 1986 Buick Electra automobile to be transferred to the plaintiff, the same to be in roadworthy operating condition at the time of transfer.
13. A. The defendant shall use his best efforts to obtain from all lending institutions a release of any obligations which the plaintiff may have as to any debts, performance or payment bonds, or loans of any business entity in which the defendant is a participant, including, but not limited to:
 i. A certain debt owed to Connecticut National Bank for Genovese DiDonno, Inc.;
 ii. A certain debt owed to American National Bank for Town Farm Estates Partnership and Farms Development Corporation;
 iii. A certain debt to Fleet Bank/United Bank Trust Company for Construction Unlimited Corporation; and
 iv. A certain CNA Construction Bond General Agreement of Indemnity for Genovese DiDonno, Inc. and any and all of their wholly and partially owned subsidiary companies.
If the defendant is unable to secure a release of the plaintiff or to facilitate the plaintiff's release from any of the above lending or bonding institutions or other similarly situated, then the defendant shall indemnify and save the plaintiff harmless from any liability she may incur on these obligations and bonds, including reasonable attorney's fees and court costs required by the plaintiff in defense of any creditor action.
The defendant shall hold the property of the plaintiff free and harmless from any liens which may be levied or by any claims or demands of these lending and bonding institutions.
The defendant shall give the plaintiff prompt and full disclosure as to any pending or anticipated proceedings for the collection of any debt or obligation on which the plaintiff is obligated.
B. The defendant shall hold the plaintiff harmless with respect to any and all claims or demands and suits with respect to all federal and state income taxes for any year in which the CT Page 7091 parties filed a joint income tax return. If the plaintiff receives notice of an audit or a tax proceeding involving any such joint return, she shall immediately notify the defendant or his representatives of such proceedings and the defendant shall have the right to defend. In the event the plaintiff is obligated to pay any amount assessed as a deficiency, interest, penalty or otherwise, with respect to any joint federal or state income tax return or municipal tax, she shall, upon demand, be reimbursed in full by the defendant.
The defendant shall, while the plaintiff or he is contesting any taxes claimed for which he is or may be responsible hereunder, hold the property of the plaintiff free and harmless from any liens which may be levied by any taxing authority in connection with such contest or the taxes claimed thereon. The defendant's indemnification shall include reasonable attorney's fees required by the plaintiff in defense of any action taken by any taxing authority.
14. The plaintiff shall have exclusive possession of the premises located at 25 Pattonwood Drive, Southington, Connecticut. Arrangements shall be made between the parties for the defendant's removal of his items of tangible personal property as set forth in Exhibit B attached hereto.
15. As previously ordered, the defendant shall return to the plaintiff all of her personal notes, diaries, and letters in his possession forthwith.
16. The defendant shall transfer and assign to the plaintiff all of his right, title and interest in and to a certain MONY insurance policy in the amount of $500,000 on the life of the plaintiff. The plaintiff shall be free to designate any beneficiary whom she chooses on said policy.
17. The remaining tangible personal property at 25 Clearview Court in South Palm Coast, Florida, after removal of those items set forth in Schedule A attached hereto as belonging to the plaintiff, shall be the property of the defendant. The plaintiff shall make arrangements for the removal of the items in Schedule A within a reasonable period of time but not longer than sixty (60) days from the date hereof.
18. The plaintiff shall be restored the use of her birth name, Judith Kozlowski.
Judgment shall enter in accordance with the foregoing.
EDGAR W. BASSICK, III, JUDGE CT Page 7092
Attachments: Schedule A Schedule B
SCHEDULE A
PERSONAL PROPERTY OF PLAINTIFF-WIFE (FROM FLORIDA VACATION HOME)
1. Master bedroom: clothes and shoes king queen chairs; lingerie chair; boudoir chair framed fan pictures; four (4) silk women pictures; mirror over vanity; clear glass vase; lamps
2. Master bath — amber vase
3. Den — books Gout stools
4. Laura's room: pictures maps; bed tray Queen Ann chair; bench; easel
5. Spare room bath — two (2) vases
6. Hall: rose painting; pitcher painting; framed prints two (2) green bottles
7. Living room: step library stand paintings; mirrors kidney desk Chair; small round tables; stool rug under coffee table; small rug ash trays; vase; Aztec calendar stand Greek lamp
8. Dining room: bell cord; linens Italian coffee set; sconce angels; Federal Mirror; hummingbird prints glass dishes; Polish punch bowl; serving dishes church painting
9. Foyer: "Gone with the Wind" lamp Chinese print; ceramic bird two (2) scatter rugs
10. Kitchen: flowered lamp; chandelier (in garage) kitchen set; buffet
11. Laundry room: personal items from cabinets calendar planters CT Page 7093
12. Porch: swing end tables; lounge chair
13. Hall closet: planter bowls canes
SCHEDULE B
PERSONAL PROPERTY OF DEFENDANT-HUSBAND (FROM MARITAL RESIDENCE)
1. Master bedroom: bed large double dresser; armoire two (2) night stands
2. Den: leather couch; recliner old television wall hangings (saw; clamp; barometer; clock; 2 lamps)
3. Walking machine
4. Weight machine
5. Shuffle board
6. Clothes
7. Personal papers and pictures (to be sorted by plaintiff)
8. Sports equipment from garage
9. Golf cart